John Heenan
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091
john@lawmontana.com

Lesley E. Weaver*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com

*Counsel for Plaintiff Hollis and
the Proposed Class*

*Additional counsel appear on signature page*

*\* Pro Hac Vice application forthcoming*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| JONATHON HOLLIS, individually, and on behalf of all others similarly situated, | Case No. <u>CV-24-99-BU-BMM</u> |
| Plaintiff, | **CLASS ACTION COMPLAINT JURY** |
| v. | **TRIAL DEMANDED** |
| SNOWFLAKE, INC., | |
| Defendant. | |

Plaintiff Jonathon Hollis, individually and on behalf of all others similarly situated, brings this class action against Snowflake, Inc. ("Defendant"), and alleges, upon personal knowledge as to his own actions, and upon information and belief as to his counsel's investigation and as to all other matters, as follows:

## I.    INTRODUCTION

1.    Plaintiff brings this proposed class action against Defendant for its failure to safeguard the sensitive information of its customers from a foreseeable cyberattack. Plaintiff's personally identifiable information ("PII") was compromised as a result of the breach of cloud-based data records stored with and entrusted to Snowflake.

2.    Snowflake is a large cloud-based data warehouse platform that provides businesses with "a single platform to access all data, including data that's unstructured, in open formats, and from third-parties."[1] Snowflake's over 9,000 clients include AT&T, Adobe, Kraft Heinz, Mastercard, Micron, Capital One, DoorDash, HP, Nielsen, Novartis, Okta, PepsiCo, Siemens, Instacart, JetBlue, NBCUniversal, US Foods, Western Union, Yamaha, and many others.

3.    Snowflake promotes itself as a leader in the data security industry that "was built to deliver end-to-end data security for all users."[2] It purportedly "follows

---

[1] https://www.snowflake.com/en/why-snowflake/ (last visited September 11, 2024).

[2] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security (last visited September 11, 2024).

world-class, standards-based practices for the controls and processes that secure it and is based on a multilayered security architecture to protect customer data and access to that data."[3] Snowflake states that "[a]ll aspects of [its] architecture, implementation, and operation are designed to protect customer data in transit and at rest against both current and evolving security threats."[4]

4.      Notwithstanding its proclaimed first-in-class data security standards, on May 23, 2024, Snowflake became aware that an unauthorized third party had gained access to Snowflake's platform and accessed numerous of its clients' accounts (the "Data Breach"). The third-party threat actor, tracked as UNC5537, claimed to have accessed employee and customer data for 165 of Snowflake's clients, including AT&T, Advanced Auto Parts, LendingTree's subsidiary QuoteWizard, Ticketmaster, and Santander Bank.

5.      Subsequently, many of Snowflake's clients revealed that the data they had stored on Defendant's platform had been exfiltrated in the Data Breach. In a Form 8-K filed with the Securities and Exchange Commission ("SEC") on July 12, 2024, AT&T stated that data of "nearly all" of its over 110 million wireless customers, and the customers of mobile virtual network operators that use AT&T's wireless networks, had been illegally downloaded from AT&T's workspace on a

---

[3] *Id.*
[4] *Id*.

third party cloud platform, which AT&T later confirmed was operated by Snowflake. According to AT&T, the exposed data includes customers' phone numbers, records of calls and text messages, and other call and text log information from between May 1, 2022 and October 31, 2022, as well as on January 2, 2023.

6.      Defendant's failure to implement standard security measures was a significant factor leading to the Data Breach. Snowflake did not automatically require its clients to use multifactor authentication ("MFA"), for instance, despite being well aware of the risks of cyberattack and data theft. In fact, a selling point of Snowflake's systems was that they were easy to use and clients did not need to set up additional security configurations.[5]

7.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the sensitive and personally identifiable information of Plaintiff and other members of the proposed class ("Class Members") whose data was stored and maintained by Snowflake. As a direct and proximate result of Defendant's failure to implement and follow standard security measures, the value of Plaintiff's and Class Members' personal information diminished. Plaintiff and Class Members further face an increased risk of identity theft and fraud due to the

---

[5] https://www.snowflake.com/en/resources/learn/snowflake-security-hub/ (last visited September 11, 2024).

Data Breach, and must also devote substantial time, money, and energy to protect themselves, to the extent possible from these crimes.

## II.    PARTIES

8.    **Plaintiff Jonathon Hollis** is a natural person, resident, and citizen of California. Upon information and belief, Plaintiff Hollis' information was stored and maintained on the cloud-based data platform operated by Defendant. As a result of Defendant's failure to safeguard Plaintiff's personal information, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach. On July 16, 2024, Plaintiff Hollis was notified by his mobile phone provider, AT&T, that his PII was compromised in Defendant's Data Breach.

9.    As a result of Defendant's conduct, Plaintiff Hollis suffered significant harm, including diminution in the value of his personal information, an increased risk of identity theft and fraud, lost time spent investigating the Breach and monitoring his accounts.

10.    **Defendant Snowflake, Inc.** is a Delaware corporation with its headquarters and principal place of business located at 106 East Babcock Street, Suite 3A, Bozeman, Montana 59715. Snowflake is a publicly traded corporation listed on the New York Stock Exchange with revenues totaling approximately $829

million for the three months ended on April 30, 2024.[6] Snowflake's Data Cloud platform is used globally, with 9,822 institutions trusting Snowflake to manage and store customers' data.[7] The "substantial majority" of such revenue comes from fees charged to Snowflake's customers "based on the compute, storage, and data transfer resources consumed on [its] platform."[8]

### III.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed class, including Plaintiff, are citizens of a state different from Defendant. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

12.    This Court has personal jurisdiction over Snowflake because Snowflake's headquarters and principal place of business is located in Bozeman, Montana.

---

[6] https://www.bamsec.com/filing/164014724000135?cik=1640147 (last visited September 11, 2024).

[7] *Id.*

[8] *Id.*

# IV.    FACTUAL ALLEGATIONS

## A.    Defendant Represented That It Would Keep Customers' Data Safe and Secure

13.    Snowflake is a cloud-based platform that provides "digital warehouse" storage and analytics services to over 9,000 clients, which are generally businesses and companies such as AT&T, Capital One, NBCUniversal, and Ticketmaster, among many others. Snowflake states on its website that "everything is easier in the AI data cloud."[9] It promises that by eliminating data silos and simplifying architecture through the use of Snowflake, the user "can get more value from your data." Snowflake encourages companies to take advantage of the "near-infinite scale" of its cloud storage: "Bring more workloads, users and use cases directly to your data."

14.    In addition to the advantages of the "infinite storage" available in cloud-based data storage, Snowflake also highlights the cost-saving benefits of its services. Its fully managed cloud service can "automate costly and complex operations to reduce overheard [sic] and improve efficiency." Among the key elements of its platform described in its most recent Form 10-K, filed on March 26, 2024, Snowflake touted its "optimized price-performance": "Our platform uses advanced optimizations to efficiently access only the data required to deliver the desired

---

[9] https://www.snowflake.com/en/ (last visited September 11, 2024).

results. It delivers speed without the need for tuning or the expense of manually organizing data prior to use. Organizations can adjust their consumption to precisely match their needs, always optimizing for price-performance."

15.    Snowflake points to AT&T for a case-study of the cost-saving benefits of the cloud:

> AT&T Provides Faster Insights While Lowering Estimated Annual Costs by 84%. This premier enterprise gives more teams near-instant access to powerful insights for better decision-making and customer experiences — all while cutting costs and improving performance by switching to Snowflake.
> KEY RESULTS: 84% Savings on estimated annual costs, thanks to results caching."[10]

Among the highlights of the AT&T case-study, Snowflake identified the following:

- Proactive troubleshooting for a better customer experience: Democratized access to data helps AT&T find and fix issues—before they impact customers.

- Greater collaboration, fewer silos: Snowflake's Secure Data Sharing eliminates internal silos and allows AT&T's business partners to maintain control of their data while sharing—without having to move or copy data.

---

[10] https://www.snowflake.com/en/customers/all-customers/case-study/att/ (last visited September 11, 2024).

16.    Snowflake markets itself as a leader in the data security industry, claiming to "set the standard for data security." It claims it "was built to deliver end-to-end data security for all users," "world-class, standards-based practices for the controls and processes . . . to protect customer data and access to that data," and "comprehensive security framework."[11] It further claims that "[a]ll aspects of Snowflake's architecture, implementation, and operation are designed to protect customer data in transit and at rest against both current and evolving security threats."[12]

17.    Snowflake further acknowledges the risk of data breaches and utilizes this threat to promote its products. Snowflake's website states, for instance:[13]

- "In today's connected world where cybercriminals have greater opportunity than ever before, data security is crucial for every business."

- "Data breaches cause customers to lose trust in a business, and they can significantly damage a company's reputation if news of the breach gets out to the media."

---

[11] *Intro to Data Security*, SNOWFLAKE, https://www.snowflake.com/trending/intro-to-data-security (last visited September 11, 2024).
[12] *Id.*
[13] *Id.*

8

- "[D]ata security should be a priority for every business in every industry, not just highly regulated industries such as healthcare and finance."

18.    Snowflake has experienced great success and tremendous growth for the company as a result of its offering of cloud-based data warehousing services. It posted a revolving graphic identifying some of the more than 7,200 "leading companies [that] lead with Snowflake," including Zoom, Sub-Zero, Orangetheory Fitness, Adobe, Cisco, Comcast, and the University of Notre Dame, in addition to AT&T and other companies previously mentioned. In its latest Form 10-K, Snowflake noted that in the month of January alone, "we processed an average of approximately 4.2 billion daily queries across all our customer accounts, up from an average of approximately 2.6 billion daily queries during the corresponding month of the prior fiscal year." And as of January 31, 2024, Snowflake had 9,437 customers, up from 7,744 customers as of January 31, 2023. Snowflake's revenue similarly increased: "For the fiscal years ended January 31, 2024, 2023, and 2022, our revenue was $2.8 billion, $2.1 billion, and $1.2 billion, respectively, representing year-over-year growth of 36% and 69%, respectively."

19.    Partly as a result of its representations, Snowflake's clients entrust it with large amounts of customer data.

**B.**    **Plaintiff's and Class Members' PII was Exposed in the Data Breach**

20.    In April 2024, the cybersecurity firm, Mandiant, received information regarding a suspected theft of data from Snowflake's platform. Mandiant informed Snowflake and was engaged by Snowflake to investigate the suspected breach. Pursuant to that investigation, Mandiant determined that Snowflake's platform had been compromised by a threat actor "using credentials previously stolen via infostealer malware" and that the threat actor "used these stolen credentials to access the customer's Snowflake instance and ultimately exfiltrate valuable data."[14]

21.    Mandiant further concluded that "the credentials were easily accessed by bad actors in part because impacted accounts were not configured with multi-factor authentication enabled, meaning successful authentication only required a valid username and password." While Snowflake made MFA available to its customers, the use of MFA was not required to access customers' data and administrators could not set MFA policies systemwide.

22.    Analysis also showed that some of the compromised Snowflake credentials had been for sale on the Dark Web for years and were still valid, which means those credentials hadn't been rotated or updated, as would be typically required in a secured system.[15] Further, Snowflake did not create or require its clients

---

[14] https://cloud.google.com/blog/topics/threat-intelligence/unc5537-snowflake-data-theft-extortion (last visited September 11, 2024).
[15] https://www.darkreading.com/threat-intelligence/snowflake-account-attacks-driven-by-exposed-legitimate-credentials (last visited September 11, 2024).

to create network allow lists, which is a list of sanctioned entities, such as IP addresses, domains, and applications, to control access to Snowflake's service or internal stage.[16]

23.    Moreover, Snowflake did not provide proper guidance to its clients, such as AT&T, regarding setting secure configurations. In fact, a selling point of Snowflake's systems was the fact that it could be easily used by its clients without having to set up additional security configurations. Had Snowflake required these security configurations, the Data Breach may have been avoided.

24.    On May 22, 2024, Mandiant began contacting Snowflake's clients to inform them of the breach. As of June 10, 2024, Mandiant and Snowflake had notified approximately 165 potentially exposed organizations. The organizations whose data were compromised as a result of this Breach include AT&T, Advanced Auto Parts, LendingTree's subsidiary QuoteWizard, Ticketmaster operator Live Nation, and Santander Bank.

25.    The stolen data includes the phone numbers of AT&T's cellular and landline customers and records of calls and text messages between May 1, 2022 and October 31, 2022, as well as on January 2, 2023. The stolen data also includes records identifying every phone number that an AT&T phone number interacted with, including the phone numbers of non-AT&T customers, the number of times

---

[16] https://docs.snowflake.com/en/user-guide/network-policies (last visited September 11, 2024).

AT&T customers interacted with those other phone numbers, the total count of AT&T customers' calls and texts, and aggregated duration of calls.

26.    AT&T disclosed in its Form 8-K that "[f]or a subset of records, one or more cell site identification number(s) are also included."[17] While AT&T stated that the compromised data did not include customer names, it admitted that "there are often ways, using publicly available online tools, to find the name associated with a specific telephone number."[18]

27.    The information exposed as a result of the Data Breach is uniquely sensitive, and includes PII and other sensitive data. Allowing cybercriminals to access this sensitive data leaves the customers of Snowflake's clients vulnerable to fraud and identity theft. For example, a CNN report on the incident identified several ways that bad actors can use the stolen AT&T customer data:

> [A] hacker could see that a customer is in constant contact with a big bank's line and could send a phishing attempt posing as the bank. The hacker could text the customer saying, "This is Bank of America. We have some suspicious activity on your account. Click this link to review the charges, or call this number," said John Dwyer, director of security research at Binary Defense, a cybersecurity solutions firm. Or the hacker could pose as someone the customer has a personal relationship with, like a friend or family member. The age of artificial intelligence makes this even more pressing, according to Collin Walke, cybersecurity and data privacy partner at Hall Estill. "Once they know who you've been communicating with, it allows deep fakes and those sorts of hacks to occur much easier," Walke said. Some customers' cell

---

[17] https://www.sec.gov/ix?doc=/Archives/edgar/data/732717/000073271724000009/t-20231231.htm (last visited September 11, 2024).
[18] *Id.*

tower ID numbers were also exposed, which could help some bad actors track down geolocations, Walke said. That could also make these hacking attempts more believable.

28.    On July 12, 2024, AT&T announced that data of "nearly all" its 110 million cellular customers was illegally downloaded from its workspace on a third-party cloud platform, which AT&T confirmed was operated by Snowflake.[19] On or around July 16, 2024, AT&T notified Plaintiff of the Data Breach via electronic mail ("Email Notice"). The Email Notice explained as follows:[20]

> We're reaching out to let you know that some of your data was accessed without authorization.
> . . .
>
> **What happened?**
> We found out AT&T call and text records were accessed by cyber-criminals who have claimed responsibility for unlawful access to other companies in the past. At least one individual has since been arrested.
>
> **What information was involved?**
> The investigation indicates the data included the phone numbers of some of your call interactions with wireless phone numbers from May 1, 2022 to October 31, 2022. It also included counts of those calls and total call durations for specific days or months.
>
> **The compromised data does not include the content of calls nor personal information, such as Social Security numbers, birth dates, or financial information. It also does not include some typical information you see in your usage details, such as the time stamp of calls.**

---

[19] https://www.nytimes.com/2024/07/12/business/att-data-breach.html (last visited September 11, 2024).

[20] https://www.gunsandrovers.com/forum/guns-and-rovers-main/campfire/224179-at-t-data-breach (last visited September 11, 2024).

**What is AT&T doing?**
Protecting customer data is a top priority. We have confirmed the affected system has been secured. We hold ourselves to high privacy standards and are always looking for ways to improve our security practices.

**What can you do?**
It is always advisable to be careful when taking calls from numbers that you do not recognize and stay alert to any fraud or theft attempts.

For more information and details about the information that was accessed, go to **att.com/dataincident**.

For additional tips on privacy and data protection, go to **CyberAware**.

We apologize for any inconvenience and remain committed to protecting the information in our care.

Other Snowflake clients were similarly victimized by the Data Breach. For example, Live Nation, the parent company of Ticketmaster, acknowledged that data was stolen from its Snowflake account in May 2024.[21] Although Live Nation did not specify how much data had been accessed in the Data Breach, a known cybercrime organization, ShinyHunters, said it "had stolen user data of over 500 million Ticketmaster customers."[22]

---

[21] https://www.reuters.com/technology/cybersecurity/live-nation-probing-ticketmaster-hack-amid-user-data-leak-concerns-2024-06-01/ (last visited September 11, 2024).
[22] *Id.*

**C.    The Data Breach Was a Foreseeable Risk of Which Defendant Was on Notice and Could Have Prevented**

29.    Defendant had a responsibility to protect the personal information entrusted to it by Plaintiff and Class Members by implementing sufficient security measures, including but not limited to requiring its clients to institute MFA.

30.    Defendant further had a duty to safeguard customers' PII pursuant to industry standards and duties imposed by statutes, including Section 5 of the Federal Trade Commission Act (the "FTC Act"), which requires companies to maintain reasonable and appropriate data security measures. The FTC has issued guidance specifically to the entities which use cloud-based services, and reminded them that securing the information on the cloud-based services is their corporate responsibility.[23]

31.    Defendant is a sophisticated technology company—Snowflake is one of the largest cloud storage providers in the world. Snowflake is well aware of its duty to safeguard information and that the data it collects and stores are valuable targets for data thieves. Indeed, Snowflake identifies cyberattacks as a "risk factor" that could materially affect its business in its Form 10-K.[24]

---

[23] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited September 11, 2024).

[24] https://www.sec.gov/ix?doc=/Archives/edgar/data/1640147/000164014724000101/snow-20240131.htm (last visited September 11, 2024).

32.    Yet, despite knowing that its clients' data was valuable and was at risk of cyberattack, Defendant continued to store massive amounts of its customers' data in an insecure manner.

33.    Had Snowflake provided proper guidance to its clients for setting secure system configurations, such as requiring MFA to access customers' records or setting network allow lists, the Data Breach may have been prevented. Rather than require these secure configurations, however, Snowflake marketed its systems as easy to use to its clients and did not properly monitor its clients' access.

34.    Notably, since the Data Breach, Snowflake has established a new security policy to allow administrators to require MFA for all users or specific roles—further showing that this is a reasonable safety measure that Snowflake should have implemented pre-breach.[25]

35.    Defendant was aware of the importance of MFA as it is an industry standard that should be required "wherever possible."[26] Indeed, Snowflake identifies MFA as one of "8 Data Security Solutions" it recommended to combat "Common Data Security Risks" that render organizations vulnerable to data breaches:

> Network and security authentication: SSO, MFA. Network security provides the first line of defense. Federated single sign-on (SSO) establishes trusted relationships between separate organizations and

---

[25] https://www.cybersecuritydive.com/news/snowflake-mfa-policy-change/720851/ (last visited September 11, 2024).

[26] https://www.cisa.gov/secure-our-world/require-multifactor-authentication (last visited September 11, 2024).

third parties, such as partners, allowing them to share identities and authenticate users across domains. Multi-factor authentication (MFA) only allows access to a website or application after the successful submission of two or more pieces of evidence to the authentication device.[27]

Despite understanding the importance of MFA, Defendant inexplicably failed to implement it.

36.    By failing to implement reasonable security measures to safeguard Plaintiff's and Class Members' PII, Defendant breached its duty to and disregarded the rights of Plaintiff and the Class Members.

### D.    Injuries to Plaintiff and Class Members

37.    As a result of Defendant's inadequate security and breach of its duties and obligations, the personally identifiable information of Plaintiff and Class Members was compromised through disclosure to an unauthorized criminal third party. Plaintiff and Class Members have suffered injuries as a direct and proximate result of Defendant's conduct. Plaintiff and Class Members now face an increased risk of identity theft and will consequentially have to spend, and will continue to spend, significant time and money to protect themselves due to the Data Breach.

38.    The companies that Plaintiff and other customers provided their sensitive data to paid Snowflake for its services. At least a partial payment for

---

[27] https://www.snowflake.com/trending/intro-to-data-security (last visited September 11, 2024).

Defendant's services was attributed to protecting Plaintiff's and Class Members' information in their possession, including the information released to criminals here.

39.    Plaintiff and Class Members must now spend their own time, money, and energy to monitor their accounts to ensure personal information obtained in this Data Breach is not used to further harm them. This includes the need to review all financial activity, monitor credit status, update previously secure passwords and logins to an increasing variety of accounts, scrutinize communications, and seek out and purchase credit monitoring services and identity theft protection.

40.    Once personal information is exposed, there is virtually no way to ensure that the exposed information has been recovered or contained against future misuse. In addition, there is the prospect that the stolen data can be aggregated and combined with the data from other data breaches.

## V.    CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action on his own behalf, and on behalf of the following Classes:

**The Nationwide Class**

All individuals residing in the United States whose personally identifiable information was compromised as a result of the Data Breach.

**The California Subclass**

All individuals residing in California whose personally identifiable information was compromised as a result of the Data Breach

18

42.    The Nationwide Class and Subclass is referred to herein as "Class," unless otherwise stated.

43.    Excluded from the proposed Class are: Defendant, any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant; and judicial officers to whom this case is assigned and their immediate family members.

44.    Plaintiff reserves the right to re-define the Class definition after conducting discovery.

45.    **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The Class Members are so numerous that joinder of all members is impracticable. Based on information and belief, the Class includes millions of people whose PII was compromised as a result of the Data Breach. The parties will be able to identify the exact size of the Class through discovery and Defendant's records.

46.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3)).** Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common to the Class include, but are not limited to the following:

a.  Whether Defendant had a legal duty to implement and maintain reasonable security procedures and practices for the protection of Plaintiff's and Class Members' PII;

b.  Whether Defendant breached its legal duty to implement and maintain reasonable security procedures and practices for the protection of Plaintiff's and Class Members' PII;

c.  Whether Defendant acted willfully, recklessly, or negligently in connection with the maintenance of reasonable security procedures and practices to protect Plaintiff's and Class Members PII;

d.  Whether Defendant's conduct, practices, actions, and omissions, resulted in or was the proximate cause of the Data Breach, resulting in the loss of Plaintiff's and Class Members' PII;

e.  Whether Defendant had a legal duty to provide timely and accurate notice of the data breach to Plaintiff and Class Members;

f.  Whether Defendant breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

g.  Whether and when Defendant knew or should have known that its systems were vulnerable to attack;

h.  Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

20

i. Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

j. Whether Defendant violated state Unfair Competition Laws;

k. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's conduct, including increased risk of identity theft and loss of value of their PII; and

l. Whether Plaintiff and Class Members are entitled to relief, including compensatory damaged, punitive damages, and/or statutory or civil penalties, and equitable relief.

47. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class Members. Plaintiff's claims are typical of the claims of the members of the Class because all Class Members' reimbursement payments were delayed following the Data Breach and all Class Members were harmed as a result.

48. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Pursuant to Rule 23(a)(4), Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the Class Members. Plaintiff has retained counsel experienced in prosecuting class actions and data breach cases.

49.    **Superiority (Fed. R. Civ. P. 23(b)(3)).** Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class Members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

50.    **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

  a.  the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members which would establish incompatible standards of conduct for Defendant; or

  b.  the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of

other Class Members not parties to the adjudications, or substantially

impair or impede their ability to protect their interests; or

c.  Defendant has acted or refused to act on grounds generally applicable

to the Class, thereby making appropriate final injunctive or

corresponding declaratory relief with respect to the Class as a whole.

51.     **Issue Certification (Fed. R. Civ. P. 23(c)(4)).** In the alternative, the

common questions of fact and law, set forth in Paragraph 81, are appropriate for

issue certification on behalf of the proposed Class.

## VI.     CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class Against Defendant)*

52.     Plaintiff re-alleges and incorporates by reference all preceding

paragraphs as if fully set forth herein.

53.     Defendant owed a duty to Plaintiff and all other Class Members to

exercise reasonable care in safeguarding and protecting their PII in Defendant's

possession, custody, or control.

54.     Defendant knew, or should have known, the risks of collecting and

storing Plaintiff's and all other Class Members' PII and the importance of

maintaining secure systems. Defendant knew, or should have known, of the vast

uptick in data breaches in recent years. Defendant had a duty to protect the PII of Plaintiff and Class Members.

55.    Given the nature of Defendant's business, the sensitivity and value of the PII it maintains, and the resources at its disposal, Defendant should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring, which Defendant had a duty to prevent.

56.    Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class Members' PII.

57.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

58.     But for Defendant's negligent conduct or breach of the above-described duties owed to Plaintiff and the Class Members, their PII would not have been compromised.

59.     As a result of Defendant's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) actual or attempted fraud.

**COUNT II**
**NEGLIGENCE *PER SE***
***(On Behalf of Plaintiff and the Class Against Defendant)***

60.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61.     Defendant's duties arise from Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including,

as interpreted by the FTC, the unfair act or practice by a business, such as Defendant, of failing to employ reasonable measures to protect and secure PII.

62.    Defendant violated Security Rules and Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and all other Class Members' PII and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class Members.

63.     Defendant's violations of Security Rules and Section 5 of the FTCA constitute negligence *per se*.

64.    Plaintiff and Class Members are within the class of persons that Security Rules and Section 5 of the FTCA were intended to protect.

65.    The harm occurring because of the Data Breach is the type of harm Security Rules and Section 5 of the FTCA were intended to guard against.

66.    It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release,

26

disclosure, and dissemination of Plaintiff's and Class Members' PII to unauthorized individuals.

67.     The injury and harm that Plaintiff and the other Class Members suffered was the direct and proximate result of Defendant's violations of Security Rules and Section 5 of the FTCA. Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII; (iii) breach of the confidentiality of their PII; (iv) deprivation of the value of their PII, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach; and (vi) actual or attempted fraud.

## COUNT III
### UNJUST ENRICHMENT
*(On Behalf of Plaintiff and the Class Against Defendant)*

68.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

69.     Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of monies paid for services—namely, they provided and entrusted Defendant's customers with their valuable PII. Defendant's customers, in turn, entrusted Plaintiff's and the Class Members' information to Defendant, and on

behalf of Plaintiff and the Class paid a fee to Defendant for its data storage services. Therefore, Defendant has been receiving payments (at least in part) intended to protect Plaintiff's and Class Members' information. Defendant's customers fund their data security measures (including to payments to Defendant) from payments made by and on behalf of Plaintiff and the Class Members.

70.    Defendant's customers paid Defendant (on behalf of Plaintiff and the Class) for its data storage services, a portion of which was intended to provide them with a reasonable level of data security from both Defendant's customers and Defendant in order to protect Plaintiff's and the Class Members' PII.

71.    In exchange for their payment, Plaintiff and Class Members were entitled to reasonable measures to protect their PII.

72.    Defendant appreciated, accepted, and retained the benefit bestowed upon them under inequitable and unjust circumstances arising from their conduct toward Plaintiff and Class members as described herein—namely, (a) Plaintiff and Class members conferred a benefit on Defendant, and Defendant accepted or retained that benefit; and (b) Defendant used Plaintiff's and Class Members' PII for business purposes.

73.    Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide full compensation for the benefit provided on behalf of Plaintiff and Class Members.

74.    Defendant acquired the PII through inequitable means in that it failed to disclose its inadequate security practices previously alleged.

75.    Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and the Class.

76.    Under the circumstances, it would be unjust and unfair for Defendant to be permitted to retain any of the benefits conferred by or on behalf of Plaintiff and the Class.

77.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the PII belonging to Plaintiff and Class Members because Defendant failed to implement the data management and security measures that industry standards mandate.

78.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received on behalf of and for the benefit of Plaintiff and the Class.

<u>**COUNT IV**</u>
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
*(On Behalf of Plaintiff and the Class Against Defendant)*

79.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

80.    Defendant entered into contracts with its various corporate clients to provide data storage services and maintain secure data cloud systems. These contracts were made expressly for the benefit of Plaintiff and Class Members, who were customers and/or employees of Defendant's corporate clients. In order to effectuate offered services and upon information and belief as to the exact terms of the contract, Defendant agreed to collect, store, and protect Plaintiff's and Class Members' PII.

81.    Thus, the benefit of collection, protection, and storage of the PII was the direct, intended, and primary objective of the contracting parties.

82.    Defendant breached its contracts with its customers when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' PII.

83.    Defendant knew that if it were to breach its contracts, the harm would befall its clients' customers and employees for whom the benefit was intended to confer. As such, Defendant's failure to uphold the terms of its contracts and allow for the Data Breach has foreseeably harmed Plaintiff and the Class.

84.    Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, along with their costs including attorneys' fees incurred.

<u>**COUNT V**</u>
**INVASION OF PRIVACY**
*(On Behalf of Plaintiff and the Class Against Defendant)*

85.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

86.    Plaintiff and Class Members have a legally protected privacy interest in their PII that Defendant required them to provide and/or allow them to store.

87.    Plaintiff and Class Members reasonably expected their PII would be protected and secured from unauthorized parties, would not be disclosed to any unauthorized parties or disclosed for any improper purpose.

88.    Defendant unlawfully invaded the privacy rights of Plaintiff and Class Members by (a) failing to adequately secure their PII from disclosure to unauthorized parties for improper purposes; (b) leaving their PII exposed to unauthorized parties in a manner that is highly offensive to a reasonable person; and (c) leaving their PII exposed to unauthorized parties without the informed and clear consent of Plaintiff and Class Members. This invasion into the privacy interest of Plaintiff and Class Members is serious and substantial.

89.    In failing to adequately secure Plaintiff's and Class Members' PII, Defendant acted in reckless disregard of their privacy rights. Defendant knew or should have known that its substandard data security measures are highly offensive to a reasonable person in the same position as Plaintiff and Class Members.

31

90.    Defendant violated Plaintiff's and Class Members' right to privacy under the common law as well as under state and federal law.

91.    As a direct and proximate result of Defendant's unlawful invasions of privacy, Plaintiff's and Class Members' PII has been viewed or is at imminent risk of being viewed, and their reasonable expectations of privacy have been intruded upon and frustrated. Plaintiff and the proposed Class have suffered injury as a result of Defendant's unlawful invasions of privacy and are entitled to appropriate relief.

**COUNT VI**
**DECLARATORY RELIEF**
***(On Behalf of Plaintiff and the Class Against Defendant)***

92.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

93.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's duties to safeguard and protect Plaintiff's and Class Members' PII. Defendant's security measures were (and continue to be) woefully inadequate. Defendant disputes these contentions and contend that its security measures are appropriate.

94.    Plaintiff and Class Members continue to suffer damages and exposure to other injury and harm, and without a declaratory relief, they will likely continue to suffer further injury, a possibility of a future data breach, and harm.

95.     Therefore, Plaintiff and Class Members request a judicial determination of their rights and duties, and ask the Court to enter a judgment declaring, *inter alia*, (i) Defendant owed (and continues to owe) a legal duty to safeguard and protect Plaintiff's and Class Members' confidential and sensitive PII, and timely notify them about the Data Breach, (ii) Defendant breached (and continue to breach) such legal duties by failing to safeguard and protect Plaintiff's and Class Members' PII, and (iii) Defendant's breach of its legal duties directly and proximately caused the Data Breach, and the resulting damages, injury, or harm suffered by Plaintiff and Class Members. A declaration from the Court ordering Defendant to stop its illegal practices is required. Plaintiff and Class Members will otherwise continue to suffer harm as alleged above.

### 1.     <u>CLAIMS ON BEHALF OF THE CALIFORNIA SUBCLASS</u>

### <u>COUNT VII</u>
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL"), CAL. BUS. & PROF. CODE §§ 1700, *et seq.***
***(On Behalf of California Plaintiff and the California Subclass Against Defendant)***

96.     Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

97.     Plaintiff Hollis (the "California Plaintiff") brings this Claim on behalf of himself and members of the California Subclass.

98.    The UCL prohibits any "unlawful," "fraudulent" or "unfair" business act or practice and any false or misleading advertising, as those terms are defined by the UCL and relevant case law. By virtue of the above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Defendant engaged in unlawful, unfair and fraudulent practices within the meaning, and in violation of, the UCL.

99.    In the course of conducting its business, Defendant committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII, and by violating the statutory and common law alleged herein. Plaintiff and Class Members reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

100.    Defendant's above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendant's wrongful conduct is substantially injurious to consumers, offends

34

legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant's practices are also contrary to legislatively declared and public policies that seek to protect PII and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the Article I, Section 1 of the California Constitution (California's constitutional right to privacy) and the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 45). The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

101. The UCL also prohibits any "fraudulent business act or practice." Defendant's above-described claims, nondisclosures and misleading statements were false, misleading and likely to deceive the consuming public in violation of the UCL.

102. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and its violations of the UCL, Plaintiff and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud—risks justifying

expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII, (iv) statutory damages, (v) deprivation of the value of their PII, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

103.   Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of himself individually, Class Members, and the general public, also seeks restitution and an injunction prohibiting Defendant from continuing such wrongful conduct, and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Bus. & Prof. Code § 17203.

## COUNT VIII
### VIOLATION OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE §§ 1750, *et seq.*
### *(On Behalf of California Plaintiff and the California Subclass Against Defendant)*

104.   Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

105.   Plaintiff Hollis (the "California Plaintiff") brings this Claim on behalf of himself and members of the California Subclass.

106.   The California Consumer Legal Remedies Act ("CLRA") prohibits certain "unfair methods of competition and unfair or deceptive acts or practices" in connection with a sale of goods.

107.   Defendant's unlawful conduct described herein was intended to increase sales to the consuming public and violated and continue to violate Section 1770(a)(5), (a)(7), and (a)(9) of the CLRA by representing that the products and services have characteristics and benefits which they do not have.

108.   Defendant fraudulently deceived California Plaintiff and the California Subclass by representing that its products and services have certain characteristics, benefits, and qualities which they do not have, namely data protection and security. In doing so, Defendant intentionally misrepresented and concealed material facts from California Plaintiff and the California Subclass, specifically by advertising secure technology when Defendant in fact failed to institute adequate security

measures and neglected system vulnerabilities that led to a data breach. Said misrepresentations and concealment were done with the intention of deceiving California Plaintiff and the California Subclass and depriving them of their legal rights and money.

109.   Defendant's claims about the products and services led and continues to lead consumers like California Plaintiff to reasonably believe that Defendant has implemented adequate data security measures when Defendant in fact neglected system vulnerabilities that led to a data breach and enabled hackers to access consumers' PII.

110.   Defendant knew or should have known that adequate security measures were not in place and that consumers' PII was vulnerable to a data breach.

111.   California Plaintiff and the California Subclass have suffered injury in fact as a result of and in reliance upon Defendant's false representations.

112.   California Plaintiff and the California Subclass would not have purchased the products or used the services, or would have paid significantly less for the products and services, had they known that their PII was vulnerable to a data breach.

113.   Defendant's actions as described herein were done with conscious disregard of California Plaintiff's rights, and Defendant was wanton and malicious in its concealment of the same.

114.    California Plaintiff and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair, unlawful, and fraudulent conduct. Specifically, California Plaintiff and the California Subclass paid for products and services advertised as secure, and consequentially entrusted Defendant with their PII, when Defendant in fact failed to institute adequate security measures and neglected vulnerabilities that led to a data breach. California Plaintiff and the California Subclass would not have purchased the products and services or would not have provided Defendant with their PII, had they known that their PII was vulnerable to a data breach.

115.    Defendant should be compelled to implement adequate security practices to protect consumers' PII. Additionally, California Plaintiff and the members of the California Subclass lost money as a result of Defendant's unlawful practices.

116.    At this time, California Plaintiff and the California Subclass seek injunctive relief under the CLRA pursuant to Cal. Civ. Code § 1782(d); but they anticipate the need to amend the complaint and seek restitution.

## COUNT IX
## CALIFORNIA CONSUMER PRIVACY ACT,
### CAL. CIV. CODE § 1798, *et seq.*
### *(On Behalf of California Plaintiff and the California Subclass Against Defendant)*

117.   Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

118.   Plaintiff Hollis (the "California Plaintiff") brings this Claim on behalf of himself and members of the California Subclass.

119.   The California Consumer Privacy Act ("CCPA") protects California consumers' constitutional right to privacy and provides consumers with a private right of action against businesses that breach their duty to take reasonable steps to protect consumers' personal information from unauthorized access, theft, or disclosure. Cal. Civ. Code § 1798.150(a)(1).

120.   Defendant Snowflake is a "Business" as defined by the CCPA: a "legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners, that collects consumers' personal information," and that both does business in the State of California and has "annual gross revenues in excess of twenty-five million dollars ($25,000,000)." Cal. Civ. Code § 1798.140(d).

121.   California Plaintiff and the California Subclass are consumers as defined by the CCPA: "'Consumer' means a natural person who is a California resident." Cal. Civ. Code § 1798.140(i).

40

122. Defendant stored California Plaintiff's and the California Subclass' personal information, as defined by the CCPA: "'Personal information' means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civ. Code § 1798.140(v)(1). Personal information can include but is not limited to: "Identifiers such as a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, social security number, driver's license number, passport number, or other similar identifiers." Cal. Civ. Code § 1798.140(v)(1)(A).

123. Defendant collected, stored and/or transmitted California Plaintiff's and the California Subclass' personal information in a nonencrypted and nonredacted form. As a business under the CCPA, Defendant owed a duty to Plaintiff and the California Subclass "to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information." Cal. Civ. Code § 1798.150(a)(1). California Plaintiff's personal information was accessed by third parties without authorization, demonstrating that Defendant failed in its duty to implement and maintain reasonable security procedures and practices to protect California Plaintiff's personal information.

124.    As a direct and proximate result of Defendant's failure to implement and maintain reasonable security procedures and practices appropriate to the nature of California Plaintiff's personal information, California Plaintiff suffered unauthorized access and exfiltration, theft, or disclosure of his personal information.

125.    As a direct and proximate result of the unauthorized disclosure of their personal information, California Plaintiff was injured and is at high risk of suffering further injury, including future data breaches, identity theft and fraud, and negative impact to his credit.

126.    California Plaintiff seeks injunctive relief, actual damages, statutory damages, and any other relief the Court deems proper pursuant to the CCPA, such as costs and attorneys' fees.

**COUNT X**
**CALIFORNIA CUSTOMER RECORDS ACT,**
**CAL. CIV. CODE § 1798.80,** *et seq.*
*(On Behalf of California Plaintiff and the California Subclass Against*
*Defendant)*

127.    Plaintiff re-alleges and incorporates by reference all preceding factual allegations as though fully set forth herein.

128.    Plaintiff Hollis (the "California Plaintiff") brings this Claim on behalf of himself and members of the California Subclass.

129.    The California Customer Records Act ("CRA") was enacted "to ensure that personal information about California residents is protected." Cal. Civ. Code

§1798.81.5(a)(1). The CRA requires that any business "that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure." Cal. Civ. Code §1798.81.5(b).

130.   Defendant owns, maintains, and licenses personal information about California Plaintiff and the California subclass, as defined by the CRA.

131.   Defendant failed to implement and maintain reasonable security procedures and practices to protect California Plaintiff's personal information from unauthorized access, destruction, use, modification, or disclosure, thereby violating the CRA.

132.   As a direct and proximate result of Defendant's violation of the CRA, California Plaintiff's personal information was accessed without authorization in the Data Breach.

133.   Further, Defendant did not timely notify California Plaintiff of the Data Breach, thereby violating the notice provisions of the CRA, which require that "disclosure shall be made in the most expedient time possible and without unreasonable delay." Cal. Civ. Code §1798.82(a).

134.   As a direct and proximate result of Defendant's violations of the CRA, California Plaintiff suffered damages and injury and is at high risk of suffering

further damage and injury, including time and expenses related to monitoring his

financial accounts and credit for fraudulent activity and increased risk of identity

theft and fraud.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and Class Members, requests

judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and his
      Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful
      conduct complained of herein pertaining to the misuse and/or
      disclosure of the PII of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to,
      injunctive and other equitable relief as is necessary to protect the
      interests of Plaintiff and Class Members, including but not limited to
      an order:

      i.     prohibiting Defendant from engaging in the wrongful and
             unlawful acts described herein;

      ii.    requiring Defendant to protect, including through encryption, all
             data collected through the course of its business in accordance
             with all applicable regulations, industry standards, and federal,

state, or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v.     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and controls, so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal

security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.  requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.  requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.  requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.  requiring Defendant to implement logging and monitoring

programs sufficient to track traffic to and from Defendant's servers; and

xvii.  for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    For such other and further relief as this Court may deem just and proper.

## VIII. <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: September 13, 2024          Respectfully submitted,

*/s/ John Heenan*
John Heenan
john@lawmontana.com
**HEENAN & COOK**
1631 Zimmerman Trail
Billings, Montana 59102
Tel: (406) 839-9091

Lesley E. Weaver*
Anne K. Davis*
Joshua D. Samra*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020
lweaver@bfalaw.com
adavis@bfalaw.com
jsamra@bfalaw.com

Gregory S. Mullens*
**BLEICHMAR FONTI & AULD LLP**
75 Virginia Road, 2nd Floor
White Plains, New York 10603
Tel.: (415) 445-4006
gmullens@bfalaw.com

***Counsel for Plaintiff Hollis and the Proposed Class***

**Pro Hac Vice application forthcoming*